(108 App. Div. 113.)

## HATFIELD v. LAWTON.

(Supreme Court, Appellate Division, Third Department.　October 24, 1905.)

1. LANDLORD AND TENANT—TENANCY FROM YEAR TO YEAR.

A lease of land for one year, with the privilege of continuing it from year to year so long as both parties may agree, creates a tenancy from year to year.

[Ed. Note.—For cases in point, see vol. 32, Cent. Dig. Landlord and Tenant, § 373.]

2. SAME—TERMINATION.

Where a lease from year to year commenced April 1, 1901, and in March, 1904, the tenant abandoned the land and notified the landlord he did not wish to occupy it another year, and the landlord leased it to another party from April 1, 1904, the first lease terminated at that date.

3. SAME—EMBLEMENTS.

Where a tenant from year to year sows a crop of rye, and before the end of a year and before the crop is harvested abandons the land and gives notice that he will not take it another year, and the surrender is accepted, he is not entitled to the crop as emblements, though in abandoning the lease he reserved the crop, where such condition was not accepted by the landlord.

Appeal from Schuyler County Court.

Action by Warner Hatfield against John D. Lawton.　From a judgment in favor of plaintiff, defendant appeals.　Affirmed on opinion of court below.

The contention is over a crop of rye, which was sown by the defendant on the land of Mrs. Jane Lee in the town of Reading and harvested by the defendant.　Mrs. Lee made a written lease of the land (64 acres) to the defendant, dated March 13, 1901, and the defendant entered into possession under the lease on the 1st day of April, 1901.　The defendant's term, as provided in the lease, was "for the term of one year from the 1st day of April, 1901, with the privilege of continuing the same from year to year so long as both parties may agree."　The defendant by the lease was to pay Mrs. Lee the "yearly rental of $125 in cash, payable monthly."　The defendant continued in possession of the farm until some time in March, 1904, when, without any notice to quit being given him by or on behalf of Mrs. Lee, he gave her notice that he did not care to occupy the farm another year, abandoned or left the farm, and surrendered possession to the plaintiff, who, on the 21st day of March, 1904, rented the farm of Mrs. Lee for the term from April 1, 1904, to April 1, 1905.　Under this lease the plaintiff went into possession of the farm about April 1, 1904.　The defendant, while occupying the farm, and in the fall of 1903, sowed on the farm 14 acres of rye; it being the rye in question.　The defendant paid the rent as provided in the lease up to the time he gave up the premises—up to April 1, 1904.　When defendant notified Mrs. Lee that he would not occupy the premises for another year, he stated to her that he reserved the crop of rye; but such reservation was not assented to by Mrs. Lee, nor by any one on her behalf.　The plaintiff claims the ownership of the rye under his lease for the year 1905 aforesaid, and by assignment from Mrs. Lee.　The defendant claims that, as no notice to quit has been given him by Mrs. Lee before he sowed the rye, it became his property as emblements under his lease.　Mrs. Lee did not serve defendant with any notice to leave or quit April 1, 1904, because she was willing and expected he would keep the farm another year.

The following is the opinion of Keeler, J., in the County Court:

"The defendant undoubtedly under the terms of his lease became a tenant from year to year.　In Pugsley v. Aikin, 11 N. Y. 494, some of the statements of the court would carry the inference that such a tenancy, when created by

the agreement of the parties, can in no case be terminated, even at the end of any year, except by a six months' notice to quit given by one or the other of the parties to it. That case was decided in the year 1854. But the more one studies the cases upon the question, both before and since that time, the more we think one will be convinced of the truth of the note on page 188 of Girard on Titles to Real Estate, where he says, discussing the termination of estates by notice: 'The cases on the question of the time of notice, in the case of a tenancy from year to year, are full of contradiction, and it is difficult to lay down any exact rule from these'—citing cases. Very likely this conflict arises mainly from the many slight differences in the contract of leasing, varying in each case. The decision in Pugsley v. Aikin was upon demurrer to the complaint. It will not be profitable nor pertinent to the case at bar, as we view it, to review these cases. We think the lease was legally terminated on the 1st day of April, 1904. The defendant gave notice that he did not want the premises another year, and abandoned them. The owner then accepted the tenancy as terminated. She made an absolute lease of the farm for the ensuing year to another person, receiving rent, and the new tenant took possession. The owner could not, under such circumstances, hold defendant for the rent of 1904 under his lease. Goldberg v. Mittler, 23 Misc. Rep. 116, 50 N. Y. Supp. 733; Coleman v. Fitzgerald Pri. Brewing Co., 29 Misc. Rep. 349, 60 N. Y. Supp. 460.

"Although the defendant's lease was terminated on the 1st day of April, 1904, yet under certain circumstances he might still hold the crop of rye which he had sown in the fall of 1903. Can he hold the rye under the circumstances of this case? If he holds the crop, it must be as 'emblements,' and the law seems to be settled that, if the tenancy is terminated before the crop can mature by the tenant's own act, the tenant cannot hold these 'emblements.' McAdam, in his work on Landlord and Tenant (pages 241 and 242), says, speaking of emblements: 'Tenants for life or for any other uncertain interest, on the termination of the tenancy *otherwise than by the tenant's own act* (underscoring is mine), are entitled to such crops,' etc. And again, on same page: 'One whose estate is terminated by his own act is not entitled to emblements.' In a note to the case of Batterman v. Albright, 11 L. R. A., at page 801, entitled 'Emblements—Right to, as between Landlord and Tenant,' the author says: 'Where the tenancy is terminated by the act of the landlord, as by notice to quit, the tenant has the right to take away any of the productions of land, after his tenancy ends (Oland vs. Burdwick, Cro. Eliz. 460); but it is otherwise where the tenancy is put an end to by the act of the tenant himself'—citing Debow v. Colfax, 10 N. J. Law, 151; Bulwer v. Bulwer, 2 B. & Ad. 470; Wicks v. Jordan, 2 Bulst. 213; Davis v. Eyton, 7 Bing. 154. In Wait's Actions and Defenses, vol. 4, pp. 253, 254, under the title, 'Right to Emblements and Fixtures,' the author says: 'If a tenant quits or forfeits possession, or terminates his tenancy by his own act or fault, his crops belong to the landlord'—citing Carpenter v. Jones, 63 Ill. 517, Debow v. Colfax, 10 N. J. Law, 128, Bulwer v. Bulwer, 2 B. & Ad. 470, Davis v. Eyton, 7 Bing. 154. In note to case of Lafferty v. Schuylkill R. R. R. Co., 3 L. R. A. 124, it is stated as to 'emblements' (underscoring is mine): 'On grounds of a public policy, *in order that an unforeseen termination of their interest* may not cause them to lose the fruits of their industry, tenants at will, as well as tenants for life, or their representaives, *except where the tenancy ends by the voluntary act of the tenant*, are entitled when their tenancy ends to emblements; that is, to the annual crops produced by the labor of the tenant which have been sown before the time when the tenant has knowledge that his lease is to terminate'—citing cases. Samson v. Rose, 65 N. Y. 411, was an action by the owner of the land to recover some 109 bushels of buckwheat, which the tenant or subtenant had sown and harvested. The owner had recovered possession of the land in ejectment, based upon the tenant's failure to pay rent, and had possession delivered to him after the buckwheat had been sown by the subtenant and before the crop had matured. The case was before the old Commission of Appeals, and Dwight, C., discussing the

case and the law of emblements, says (page 416): 'The whole law of emblements is derived from a rule of public policy. Its object was to encourage agriculture, by giving to such tenants as held a possession terminable upon some uncertain event a return for the capital and labor laid out and expended upon the land of another. There is no color for the view that any such allowance can be made in favor of one who has a fixed term, or *whose estate terminates* (though indefinite in its original duration) by his own act. [Italics are mine.] Thus, if an estate be given during widowhood, and a tenant marries while a crop is growing, she is not entitled to emblements.' See, also, Harris v. Gregg (Sup.) 45 N. Y. Supp. 364. And in Taylor on Landlord and Tenant (6th Ed.) § 535, under the article of 'Tenant's Right to Emblements,' the author says: 'But it is entirely different where the tenancy is put an end to by the act of the tenant himself; for in such cases he has no right to take away any of the productions of the land after his tenancy ends'—citing cases.

"The illustration of a lease to continue 'during widowhood of the lessee' cited by Commissioner Dwight (Samson v. Rose), and also by Taylor on Landlord and Tenant, § 535, is very like the case at bar. Probably the lessee did not know when she sowed the crop that she should marry before the crop matured, but she took the chances. Defendant may not have known he was going to terminate the tenancy at the end of the year when he sowed the rye, but he took the chances. In each case the termination of the tenancy was the act of the tenant. The duration of the tenancy in each case was uncertain when the grain was sown. In each case the tenant could have continued the tenancy and then reaped the emblements. I do not find any case, and none has been cited by counsel, holding that, where the tenancy is terminated at the end of the year by the voluntary act of the tenant, he is entitled to emblements; nor do we find any elementary writer laying down such a proposition. The defendant, Lawton, by his own act terminated the tenancy, and the law as has been quoted seems to be conclusive that in such a case he cannot hold the rye in question. It does not seem to us that it changes the rule of law that the defendant stated when he surrendered his term that he reserved the rye. It is not claimed that the owner of the land assented to the surrender upon any such condition. His words would not control his acts and the interpretation which the law fixes upon them in the absence of consent. It might, perhaps, be claimed that under the terms of the lease the defendant was bound to know before he sowed the rye whether or not the owner of the land was going to 'agree' to let him remain another year. Be that as it may, he certainly ought to have known whether or not he was satisfied to remain as tenant for another year. When he sowed the grain he probably thought he would remain another year. To suppose otherwise would open the view (on defendant's theory of this case) for the commission of fraud. For instance, a tenant might secretly know he was going to quit at the end of the year, not communicate such knowledge to his landlord, and then go on and sow the whole tillable part of the farm to rye and wheat, yet hold the use of the land the next year for the growth of the crops without paying rent, and hold the crops besides; the landlord supposing up to the end of the year that the tenant was going to continue for the year ensuing.

"The defendant's counsel claims error in admitting the contents of the Hatfield letter without more proof as to its loss. If there was an error of the justice in that ruling, it was harmless. When the defendant took the stand, the defendant, as a witness for himself on direct examination, stated the contents of the absent letter, in substance, and almost in identical language, with the evidence of the plaintiff. The only object of the letter was to show that the defendant's quitting the farm was a voluntary act on his part, and that fact was conceded by both sides.

"There was no question raised on the argument in this court, nor on the trial before the justice, but that the plaintiff under his lease and assignment acquired all of the rights of Mrs. Lee to the rye in question.

"The judgment must be affirmed, with costs of the appeal to the respondent."

Argued before PARKER, P. J., and SMITH, CHASE, CHESTER, and HOUGHTON, JJ.

O. P. Hurd, for appellant.

H. C. & H. B. Harpending, for respondent.

PER CURIAM.    Judgment affirmed, with costs, on the opinion of the county judge.

(108 App. Div. 78.)

FIRST NAT. BANK OF BINGHAMTON v. COMMERCIAL TRAVELLERS' HOME ASS'N OF AMERICA.

(Supreme Court, Appellate Division, Third Department.    October 24, 1905.)

1. CORPORATIONS—TRANSACTIONS WITH PRESIDENT—SECURITY FOR INDEBTEDNESS.

The president of a corporation may, in the absence of bad faith, take obligations or security from his corporation for an actual indebtedness to himself.

2. SAME—POWERS OF DIRECTORS—DELEGATION OF DUTIES.

It is only discretionary powers respecting the affairs of a corporation that a board of directors or managers is prohibited from delegating to a subcommittee or an agent.    They may vest the performance of merely ministerial duties in a committee of their own members, or in an individual.

[Ed. Note.—For cases in point, see vol. 12, Cent. Dig. Corporations, § 1330.]

3. SAME—AUTHORITY OF TREASURER—BORROWING OF MONEY—QUESTION OF FACT.

A membership corporation was engaged in business.    A number of debts and corporation notes signed in the corporate name by the treasurer were outstanding, and at an annual convention the corporation adopted a resolution instructing the board of managers to raise money or secure the corporation indebtedness in any manner deemed advisable by them.    The treasurer had general charge of the business of the association, and the board of managers knew that he had signed corporation notes, and the notes so signed by him formed a part of the indebtedness referred to in the resolution of the annual convention.    Held, that the question of the treasurer's authority to borrow money for the corporation and give its note therefor was one of fact.

4. SAME—UNAUTHORIZED ACTS OF OFFICERS—RATIFICATION.

A president of a membership association loaned considerable money to the corporation.    At an annual convention of the corporation, the treasurer included in his report to the finance committee the loan of the president.    The finance committee in its report to the convention, in effect approved the report of the treasurer, stated that the president had loaned money to the association, and recommended that he be given security for the same.    This report was approved in open convention, and the president was given a vote of thanks for the loan, and was elected to the board of managers for his own protection.    Held, that the action of the convention constituted a substantial ratification by the members of the association of a previous act of its treasurer in executing a note to the president for the amount of his loan.

5. SAME.

Stockholders of a corporation or members of a membership association may ratify and validate previously unauthorized acts and transactions of the corporation or association officers.

[Ed. Note.—For cases in point, see vol. 12, Cent. Dig. Corporations, § 1707.]